UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
No. 5:26-cv-277

| | |
|---|---|
| **JENNIFER BUTLER,**<br><br>Plaintiff,<br><br>v.<br><br>**CITY OF NEWTON,**<br><br>Defendant. | **COMPLAINT**<br>**(Jury Trial Demanded)** |

COMES NOW Plaintiff, Jennifer Butler, by and through counsel, who does allege and say of the Defendant City of Newton as follows:

## NATURE OF THE ACTION

1. This is an action for disability discrimination and retaliation under Title I of the Americans with Disabilities Act of 1990, as amended by the ADA Amendments Act of 2008, 42 U.S.C. § 12101 *et seq.* ("ADA"); sex discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"); and interference and retaliation under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* ("FMLA").

2. Plaintiff was a Sergeant with more than ten years of service in the Newton Police Department. On June 26, 2025, her direct supervisor, a male lieutenant, shot and killed a civilian at the end of a vehicle pursuit while Plaintiff was on scene. Two days later Plaintiff told the Chief of Police that she was struggling with the trauma, was not sleeping, and needed mental-health treatment through the City's Employee Assistance Program. Within ten days the City sent her home "for her mental health," then recast that leave as an internal-affairs suspension. Forty-seven days after her disclosure, the City fired her. Among the stated grounds was that she failed to render medical aid to the dying man, a charge that multiple body-worn cameras and a state investigator contradict. The lieutenant who fired the fatal shot, later indicted for second-degree murder, was kept on paid leave and was not given his termination notice until five days after Plaintiff received hers.

## PARTIES

3. Plaintiff Jennifer N. Butler ("Plaintiff" or "Sgt. Butler") is a female citizen and resident of Catawba County, North Carolina. At all relevant times she was an "employee" of Defendant within the meaning of 42 U.S.C. § 12111(4) and 42 U.S.C. § 2000e(f), and an "eligible employee" within the meaning of 29 U.S.C. § 2611(2).

4. Defendant City of Newton ("the City") is a North Carolina municipal corporation located in Catawba County, North Carolina, with its principal offices at 401 N. Main Avenue, Newton, North Carolina 28658. The City operates the Newton Police Department ("NPD" or "the Department") as one of its departments. The Department is not a legal entity separate from the City.

5. The City employs between 201 and 500 employees. At all relevant times the City was a "covered entity" and "employer" within the meaning of 42 U.S.C. § 12111(2) and (5); an "employer" within the meaning of 42 U.S.C. § 2000e(b); and an "employer" and "public agency" within the meaning of 29 U.S.C. § 2611(4)(A)(iii) and 29 U.S.C. § 203(x).

6. At all relevant times the City acted through its officials and agents, including Chief of Police Vidal A. Sipe, Captain Jonathan C. Smithey, Human Resources Director Brandon Elrod, and City Manager Sean Hovis, each of whom acted within the course and scope of his employment and with authority to take, recommend, or approve employment actions affecting Plaintiff.

## JURISDICTION AND VENUE

7. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(4), 42 U.S.C. § 12117(a), 42 U.S.C. § 2000e-5(f)(3), and 29 U.S.C. § 2617(a)(2).

8. Venue is proper in this District under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because the City resides in this District, the unlawful employment practices alleged herein were committed in this District, the employment records relevant to those practices are maintained in this District, and Plaintiff would have continued working in this District but for those practices. Venue is proper in the Statesville Division because Catawba County lies within it.

9. On January 30, 2026, Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), Charge No. 430-2026-01765, alleging discrimination based on disability and sex, and retaliation.

10. The Charge was filed within 180 days of the City's August 14, 2025, notice terminating Plaintiff's employment and of the City's December 9, 2025, final decision upholding that termination.

11. On August 19, 2026, the EEOC issued a Determination and Notice of Rights dismissing the Charge and notifying Plaintiff of her right to sue.

12. Plaintiff has satisfied all administrative prerequisites to her claims under the ADA and Title VII. Her claims under the FMLA require no administrative exhaustion.

## FACTUAL ALLEGATIONS

13. The City hired Plaintiff as a sworn law enforcement officer in July 2015. She rose to the rank of Sergeant and supervised patrol officers.

14. From approximately July 2022 through April 2023 Plaintiff served as the Department's Sergeant over Recruitment, Retention, and Hiring. She also held a General Instructor Certificate.

15. Plaintiff performed her duties at a level that met the City's legitimate expectations for more than ten years and planned to retire from the Department.

16. Plaintiff was a full-time employee. As of June 2025, she had been employed by the City for more than twelve months and had worked well over 1,250 hours during the preceding twelve months. The City employed more than 50 employees within 75 miles of Plaintiff's worksite.

17. At all times relevant to this Complaint, Plaintiff suffered and continues to suffer from post-traumatic stress disorder ("PTSD"), a mental impairment.

18. In July 2024, while on duty for the City, Plaintiff was involved in an officer-involved shooting which resulted in trauma and an exacerbation of her PTSD condition.

19. Following the 2024 shooting, the City referred Plaintiff to its Employee Assistance Program ("EAP") on or about July 18, 2024, and Plaintiff received treatment for PTSD. The City's own disciplinary paperwork records the July 18, 2024, EAP referral.

20. Plaintiff's PTSD substantially limits one or more major life activities, including sleeping, concentrating, and thinking, and the operation of major bodily functions including neurological and brain function. Its symptoms are episodic and

are triggered by traumatic events and reminders of them. When active, the condition substantially limits those activities.

21. Plaintiff also has a record of such an impairment, and the City regarded her as having such an impairment.

22. Notwithstanding her PTSD, Plaintiff was able to perform the essential functions of her position as a police Sergeant, with or without reasonable accommodation, and was a qualified individual within the meaning of 42 U.S.C. § 12111(8).

23. On June 26, 2025, Plaintiff participated in a vehicle pursuit with other officers, including her direct supervisor, Lieutenant Carlos Uribe ("Lt. Uribe"), who is male.

24. At the conclusion of the pursuit, Lt. Uribe shot a civilian, who died of his wounds.

25. Plaintiff did not use force against the civilian.

26. Plaintiff rendered medical aid to the civilian. Among other things, she assessed his injuries, cleared blood from the area where a chest seal was needed, assisted in applying a chest seal to a sucking chest wound, repeatedly checked the estimated arrival time of Emergency Medical Services ("EMS"), stayed with the civilian and reassured him while he struggled to breathe, and remained at his side until he was loaded into the ambulance. She also asked a deputy on scene to check on the civilian's condition before EMS departed.

27. Multiple body-worn cameras recorded Plaintiff's efforts to render aid.

28. The North Carolina State Bureau of Investigation investigated the shooting. Ultimately, the District Attorney's Office for Catawba County determined that Lt. Uribe's use of force was unnecessary and obtained indictments charging him with second-degree murder. Lt. Uribe plead guilty to that criminal offense and was sentenced in 2026.

29. On June 28, 2025, at approximately 12:27 p.m., Chief Sipe telephoned Plaintiff to ask how she was doing after the shooting.

30. At that time, Plaintiff told Chief Sipe that she was struggling to come to terms with the shooting due to her PTSD condition, that she was not sleeping well, and that she needed to seek help through the EAP. She told him she would call the City's EAP provider, The Counseling Group, first thing Monday morning, June 30, to schedule an appointment.

31. Chief Sipe directed Plaintiff to tell Major Beal, her commanding officer, that she would not be working Monday, June 30 and Tuesday, July 1, 2025, so that coverage could be arranged. Plaintiff did so, and she took those days off to seek treatment.

32. On June 30, 2025, Plaintiff began counseling with Heather Helton, LCMHCA, through the City's EAP provider, for symptoms arising from the shooting and related to her prior PTSD diagnosis. Plaintiff has remained in treatment for the same condition since then.

33. The City's EAP ordinarily covers a limited number of sessions. To continue covering Plaintiff's sessions beyond that limit, the EAP provider had to obtain, and did obtain, the City's approval. The City approved and paid for Plaintiff's continued EAP treatment for PTSD through September 24, 2025.

34. Plaintiff kept Chief Sipe informed of her plan to seek EAP treatment and of her absences during this period, including absences after she later tested positive for COVID-19.

35. July 8, 2025, was the one-year anniversary of the 2024 shooting. On that same date, the Plaintiff was scheduled to give an internal affairs interview concerning the June 26, 2025, incident by Chief Sipe.

36. Plaintiff asked to give her interview on another date given the significant emotional and psychological impact that the 2024 shooting had on her, before the start of her next shift. Chief Sipe refused and insisted that she come to the Department and give the interview on July 8. Plaintiff complied and was interviewed by Lieutenant Garrett.

37. After the interview Plaintiff went to Chief Sipe's office. Chief Sipe immediately commented on her disheveled appearance and told her that she "looked like shit."

38. Plaintiff told Chief Sipe that the day was the anniversary of the 2024 shooting, that she was not dealing with it well, and that this was why she had asked to be interviewed on another date.

39. When Plaintiff mentioned coming to work the next day, Chief Sipe indicated that she would not be working. He told her to take some time for herself and to "spend time with your kids," and to take time off for her mental health. He added, "You're not in trouble."

40. That day, July 8, 2025, the City placed Plaintiff on administrative leave.

41. In its position statement to the EEOC, the City admitted that it placed Plaintiff on administrative leave "to allow her to attend counseling appointments without concern for work scheduling or supervisory notification."

42. Within days, however, Chief Sipe told Plaintiff that she was in fact on administrative leave because of an internal-affairs investigation into the June 26 incident.

43. Upon information and belief, the City never provided Plaintiff with notice of her eligibility for FMLA leave, notice of her FMLA rights and responsibilities, or notice designating any of her leave as FMLA leave, for her absences on June 30 and July 1, 2025, or for her leave beginning July 8, 2025.

44. Chief Sipe told Plaintiff that if the internal-affairs investigation found policy violations, he would convene a board of unbiased officers from area agencies to review the matter.

45. Instead, on July 25, 2025, a review board convened that was composed of NPD lieutenants, several of whom harbored personal hostility toward Plaintiff, and one chief from another agency. The City has described this board as a "Use of Force Review Board," although Plaintiff was never accused of using force.

46. On August 14, 2025, Captain Smithey issued Plaintiff a memorandum entitled "Final Disciplinary Action – Internal Investigation," terminating her employment "effective immediately" and placing her on administrative leave without pay pending any appeal.

47. The termination cited the following policies: Use of Force Policy 300.6 and 300.6.1 ("Failure to render or coordinate medical aid"); Vehicle Pursuit Policy 307.3.2 ("When to Terminate a Pursuit"); Standards of Conduct Policy 320.5.7(a) ("Neglect of duty") and 320.5.5(b) (labeled "Unsatisfactory work performance"); Mobile Audio/Video Policy 421.3 ("User Responsibilities"); and Seat Belts Policy 1011.3.

48. Upon information and belief, the provision of the Department's policy manual numbered 320.5.5(b) concerns attendance and absences from duty, not work performance. The only absences Plaintiff had in the period before her termination were the days she took for mental-health treatment at Chief Sipe's direction, the administrative leave on which the City placed her on July 8, 2025, and absences for illness of which she kept Chief Sipe informed.

49. The City's "Notification of Violation of Policies and/or Procedures" accompanying the termination referenced Plaintiff's prior EAP referral of July 18, 2024, and indicated that the City had referred her to the EAP again.

50. When Captain Smithey reviewed the termination with Plaintiff on August 14, 2025, he told her that Chief Sipe "affirms" the decision, even though Chief Sipe was the first level of review in Plaintiff's appeal.

51. On the other hand, upon his indictment for second-degree murder, the City placed Lt. Uribe – the officer who pulled the trigger in the June 26, 2025, shooting - on administrative leave *with* pay. Plaintiff, who provided life-saving measures to the shooting victim, was placed on administrative leave without pay.

52. The City did not issue Lt. Uribe a termination notice until August 19, 2025, *five days after it terminated Plaintiff*.

53. The City has attributed the delay to Lt. Uribe's unavailability and to Captain Smithey's absence from the office. Yet it was Chief Sipe who personally telephoned Lt. Uribe to tell him he had been terminated; Captain Smithey was later sent to collect his Department-issued equipment and obtain his signature on the paperwork.

54. Upon information and belief, a third NPD officer present at the scene on June 26, 2025, who is male, was found by the City to have violated Department policy but was not terminated / received lesser discipline.

55. On September 4, 2025, Plaintiff presented her appeal to Chief Sipe, with Human Resources Director Elrod present.

56. During that meeting, Plaintiff asked why the termination documents charged her with an absence-related violation when she had kept Chief Sipe informed that she was seeking EAP treatment. In a recorded conversation, Chief Sipe reviewed the cited subsection, acknowledged that the termination documents cited the wrong policy, and stated that Plaintiff had never been accused of excessive absences. The City, however, never corrected the termination documents.

57. Plaintiff also objected that the review board was not composed of the unbiased outside officers Chief Sipe had promised. Chief Sipe responded that she had signed the policy manual and agreed to the process as written.

58. By memorandum dated September 4, 2025, Chief Sipe upheld the termination.

59. Throughout her appeals, Chief Sipe and City Manager Hovis knew that Plaintiff remained in counseling.

60. Plaintiff presented her appeal to City Manager Hovis on November 13, 2025. By letter dated December 9, 2025, he upheld "the recommended disciplinary action of dismissal." The City's Personnel Action Form records Plaintiff's last date of employment as December 9, 2025, the reason as "Dismissal" for "Policy Violations," and the re-employment recommendation as "No."

61. The City's charge that Plaintiff failed to render or coordinate medical aid is false. Body-worn camera footage in the City's possession shows Plaintiff rendering aid as described in Paragraph 26.

62. After the termination, the City's report of the matter was reviewed by the North Carolina Criminal Justice Education and Training Standards Commission. An investigator with the North Carolina Department of Justice reviewed the camera footage, interviews, and documentation and concluded that Plaintiff went above and beyond her duties in rendering aid.

63. The City cited an absence-related policy as grounds for termination, and its Chief of Police later conceded that Plaintiff had never been accused of excessive absences.

64. The City has given shifting and inaccurate explanations. In its EEOC position statement, the City asserted that its management "was not aware and w[as] never made aware" of Plaintiff's PTSD and was "unaware of the timing, duration, or extent of any counseling." In fact, Plaintiff told Chief Sipe on June 28, 2025, that she needed mental-health treatment; Chief Sipe directed her to take two days off to obtain it; she told him on July 8, 2025, that she was not dealing well with the anniversary of the prior shooting; the City approved extended EAP sessions for her; and the City admitted that it placed her on leave so she could attend counseling.

65. The City also told the EEOC that, immediately after the June 2025 incident, Chief Sipe asked Plaintiff whether she needed time off and she said she did not. That account is contrary to the June 28, 2025, call described above.

66. The City changed the stated basis for Plaintiff's July 8, 2025, leave from her mental health to an internal-affairs investigation within days after Chief Sipe observed her condition, and it departed from the review process Chief Sipe had described to her.

67. Only ten days separated Plaintiff's June 28, 2025, disclosure and request for treatment leave from her removal from duty on July 8, 2025, and only forty-seven days separated that disclosure from her termination on August 14, 2025.

68. The City treated Lt. Uribe, a male officer who fired the fatal shot and was indicted for (and later plead guilty to the charge of) murder, more favorably than Plaintiff by keeping him on paid leave and delaying his termination.

69. The real reasons for Plaintiff's termination were her disability, the City's perception of her as mentally impaired, her request for and use of leave and treatment for that condition, and her sex.

70. As a direct and proximate result of the City's conduct, Plaintiff has lost wages, benefits, retirement service credit, and other compensation; has suffered harm to her professional reputation and her career in law enforcement; and has suffered emotional distress, humiliation, mental anguish, and aggravation of her PTSD.

## FIRST CLAIM OF RELIEF
## (Disability Discrimination in Violation of the ADA, 42 U.S.C. § 12112(a))

71. Plaintiff incorporates the preceding paragraphs by reference.

72. Plaintiff is an individual with a disability within the meaning of 42 U.S.C. § 12102(1). She has a mental impairment, PTSD, that substantially limits one or more major life activities; she has a record of such an impairment; and the City regarded her as having such an impairment, as shown by, among other things, Chief Sipe's comments on July 8, 2025, and his decision that day to remove her from duty for her mental health.

73. Plaintiff was a qualified individual who could perform the essential functions of her position with or without reasonable accommodation.

74. Nonetheless, the City discriminated against Plaintiff on the basis of disability with respect to the terms, conditions, and privileges of her employment, including by removing her from duty, placing her on unpaid status, and discharging her, in violation of 42 U.S.C. § 12112(a) and (b).

75. At the time of her termination, Plaintiff was performing at a level that met the City's legitimate expectations, and the circumstances of her termination raise a reasonable inference of disability discrimination, including the timing, the City's knowledge of her condition, the falsity of the stated grounds, the City's reliance on an absence-related policy, and the City's shifting explanations.

76. The City's stated reasons for its actions are a pretext for disability discrimination. Plaintiff's disability was a but-for cause of her termination.

77. As a result, Plaintiff has suffered the damages described above and is entitled to the remedies provided by the Americans with Disabilities Act of 1990, as amended, including, but not limited to, 42 U.S.C. § 12117(a) and 42 U.S.C. § 1981a(a)(2).

## SECOND CLAIM FOR RELIEF
## (Retaliation in Violation of the ADA, 42 U.S.C. § 12203(a))

78. Plaintiff incorporates the preceding paragraphs by reference.

79. Plaintiff engaged in activity protected by the ADA when, among other things, she disclosed her need for mental-health treatment, requested and took time off to obtain that treatment, sought treatment through the City's EAP, and asked to reschedule her internal-affairs interview because of her condition. Each was a request for reasonable accommodation of her disability.

80. The City knew of Plaintiff's protected activity.

81. The City took materially adverse actions against Plaintiff because of that protected activity, including recasting her leave as an internal-affairs suspension, placing her on unpaid status, and terminating her employment.

82. The close timing between Plaintiff's protected activity and the adverse actions, together with the pretextual nature of the City's stated reasons, establishes that the City acted because of Plaintiff's protected activity.

83. As a result, Plaintiff has suffered the damages described above and is entitled to the remedies provided by 42 U.S.C. § 12203(c) and 42 U.S.C. § 12117(a).

## THIRD CLAIM OF RELIEF
## {Sex Discrimination in Violation of Title VII, 42 U.S.C. § 2000e-2(a)(1))

84. Plaintiff incorporates the preceding paragraphs by reference.

85. Plaintiff is a woman and a member of a protected class.

86. Plaintiff was performing her job satisfactorily and suffered adverse employment actions, including placement on unpaid status and discharge.

87. The City treated similarly situated male officers more favorably. Lt. Uribe, who fired the fatal shot, was subject to the same supervisors, internal investigation, and review process as Plaintiff, and was accused of far more serious misconduct. Yet the City kept him on paid leave and delayed issuing his termination notice until after Plaintiff's. [ADD Paragraph 54 comparator facts if confirmed.]

88. Plaintiff's sex was a motivating factor in the City's adverse actions against her, in violation of 42 U.S.C. §§ 2000e-2(a)(1) and 2000e-2(m).

89. As a result, Plaintiff has suffered the damages described above and is entitled to the remedies provided by 42 U.S.C. § 2000e-5(g) and 42 U.S.C. § 1981a(a)(1).

## FOURTH CLAIM OF RELIEF
## (Interference in Violation of the FMLA, 29 U.S.C. § 2615(a)(1))

90. Plaintiff incorporates the preceding paragraphs by reference.

91. Plaintiff was an eligible employee, and the City was a covered employer under the FMLA.

92. Plaintiff's PTSD is a "serious health condition" under 29 U.S.C. § 2611(11) and 29 C.F.R. §§ 825.113 and 825.115, because it is a chronic condition that requires periodic visits for treatment, continues over an extended period, and causes episodic periods of incapacity, and because it required continuing treatment by a health care provider.

93. Plaintiff was entitled to FMLA leave for her serious health condition. She gave the City notice of her need for leave on June 28, 2025, and again on July 8, 2025, sufficient to make the City aware that her leave might qualify under the FMLA.

94. The City interfered with, restrained, and denied Plaintiff's exercise of her FMLA rights by, among other things, failing to provide the eligibility, rights-and-responsibilities, and designation notices required by 29 C.F.R. § 825.300; recasting her leave as an investigatory suspension; and using her FMLA-qualifying absences as a negative factor in her termination, contrary to 29 C.F.R. § 825.220(c).

95. Plaintiff was prejudiced by the City's interference, including through the loss of her job, wages, and benefits, and the loss of the opportunity to structure her leave and return to work with the protections the FMLA affords.

96. The City's violations were willful.

97. Plaintiff is entitled to the remedies provided by 29 U.S.C. § 2617(a)(1), including lost wages and benefits, interest, liquidated damages, and equitable relief including reinstatement.

## FIFTH CLAIM OF RELIEF
## (Retaliation in Violation of the FMLA, 29 U.S.C. § 2615(a)(1)–(2))

98. Plaintiff incorporates the preceding paragraphs by reference.

99. Plaintiff engaged in activity protected by the FMLA by requesting and taking leave for her serious health condition.

100. The City terminated Plaintiff's employment because she requested and took that leave. Among other things, the City cited an absence-related policy as a ground for termination, and it terminated her within weeks of her leave request.

101. The City's stated reasons for the termination are a pretext for retaliation.

102. The City's violations were willful.

103. Plaintiff is entitled to the remedies provided by 29 U.S.C. § 2617(a)(1), including lost wages and benefits, interest, liquidated damages, and equitable relief including reinstatement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court:

1. Declare that the City's conduct violated the ADA, Title VII, and the FMLA;

2. Award damages to the Plaintiff for back pay, front pay, lost benefits, and other lost compensation, with prejudgment interest;

3. Award Plaintiff compensatory damages for emotional distress, mental anguish, humiliation, harm to reputation, and other non-pecuniary losses under 42 U.S.C. § 1981a, as well as punitive damages as allowed by law;

4. Award Plaintiff liquidated damages under 29 U.S.C. § 2617(a)(1)(A)(iii);

5. Award Plaintiff her reasonable attorneys' fees, expert fees, and costs under 42 U.S.C. § 12205, 42 U.S.C. § 2000e-5(k), and 29 U.S.C. § 2617(a)(3);

6. Award post-judgment interest at the legal rate;

7. Allow all issues so triable be tried by a JURY; and

8. Grant such other and further relief as the Court deems just and proper.

This is the 16th day of November 2026.

**Pope McMillan, P.A.**
Attorneys for the Plaintiff

By: /s/ Clark D. Tew
Clark D. Tew
N.C. State Bar No. 41632
P.O. Drawer 1776
Statesville, NC 28687
(704) 873-2131
ctew@popemcmillan.com